UNITED STATES v. FLEXIDEAL DRY MAT CO. (No. 3930) [1]

[1] T. D. 48113.

United States Court of Customs and Patent Appeals, January 6, 1936

*Joseph R. Jackson*, Assistant Attorney General (*William Whynman* and *Ralph Folks*, special attorneys, of counsel), for the United States.
*James W. Bevans* for appellee.

[Oral argument December 5, 1935, by Mr. Folks and Mr. Bevans]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

LENROOT, Judge, delivered the opinion of the court:

This is an appeal from a judgment of the United States Customs Court, Second Division, sustaining a protest of appellee against the classification, by the collector of the port of New York, of certain merchandise as matrix board, and assessment of duty thereon at 35 per centum ad valorem under paragraph 1413 of the Tariff Act of 1930. The protest claimed that the merchandise was dutiable at 10 per centum ad valorem under paragraph 1402 as pulpboard or cardboard. An alternative claim was made in the protest that the involved merchandise was free of duty as "mechanically ground wood pulp, chemical wood pulp, unbleached or bleached," under paragraph 1716 of said act. This claim, however, was in effect overruled by the trial court, and, as the importer took no appeal, that claim is not before us.

The said competing paragraphs, 1402 and 1413, insofar as pertinent to the issue here involved, read as follows:

PAR. 1413. * * * stereotype-matrix mat or board, 35 per centum ad valorem * * *.

PAR. 1402. Paper board, wallboard, and pulpboard, including cardboard, and leather board or compress leather, not plate finished, supercalendered or friction calendered, laminated by means of an adhesive substance, coated, surface stained or dyed, lined or vat-lined, embossed, printed, decorated or ornamented in any manner, nor cut into shapes for boxes or other articles and not specially provided for, 10 per centum ad valorem * * *.

Upon the trial the importer introduced the testimony of six witnesses, and the Government introduced the testimony of three witnesses. In addition, samples of the imported merchandise were received in evidence, and many other physical exhibits.

The trial court in its decision, after summarizing the testimony of various witnesses, stated:

After a careful consideration of the entire record, including an examination of the various exhibits, we find that the imported merchandise is uncoated cardboard having a rough uneven surface unsuitable for making stereotype mats. We therefore hold as a matter of law that it is not "stereotype-matrix mat or board" within the meaning of paragraph 1413, Tariff Act of 1930, as classified by the collector, but is properly classifiable under the provision in paragraph

1402 for "paper board, wall board, and pulpboard, including cardboard" of the kind and condition therein described, and as such is properly dutiable at 10 per centum ad valorem, as alleged by the plaintiff. That claim is therefore sustained; but as to all other merchandise the claims are overruled. Judgment will be rendered accordingly.

Before us the Government makes two contentions:

(1) That the finding of the trial court, that the involved merchandise is not "stereotype-matrix mat or board," is clearly contrary to the weight of the evidence.

(2) That if the involved merchandise is held not to be "stereotype-matrix mat or board," there is no probative evidence in the record that the involved merchandise is properly dutiable under the provisions of said paragraph 1402.

With respect to said first contention of the Government, we will briefly review the testimony on behalf of appellee and the Government.

Appellee's witness Sullivan testified that he was the proprietor of the business of appellee and was engaged in selling stereotype-matrix boards and mats throughout the United States and Canada; that he had been so engaged for the past ten years; that the samples, Collective Exhibit 1, are representative of the imported merchandise, consisting of flat sheets approximately 24 x 45 inches in size; that the surface of the sheets is uneven, the material varying "from one to five one-thousandths of an inch in thickness," and that he had never sold any product similar to Collective Exhibit 1 as stereotype-matrix board.

One Russell, a witness on behalf of appellee, testified that he was a stereotype man in the employ of the New York Daily Investment News, and had followed the work of stereotyping for 40 years. With regard to the use of stereotype-matrix mats he testified as follows:

Q. State the use that is made of it in the printing business.—A. Well, the first step is in the composing room. In the composing room, the type is set up. The composing room makes that up, arranges it, in a chase in the pages to produce the complete paper. After the type is so arranged, it is locked in a sealed chase and delivered to the stereotype department. We place a mat on top of this type with a molding body on top of the mat and pass that under a roller with considerable pressure applied to make the exact impression in the mat of the type which is locked up in the chase. It is passed through the molding machine under a roller under considerable pressure to get the impression on the mat. From that, we cast a metal plate, from the mat. We put it through a process, what we call planking, so that the planks will not break down in the process of casting the plate, and so it will print smooth and to make it look clear. We put the cast in a mold, lock it up and then pour molten metal on it to a thickness of seven-sixteenths of an inch. When that is cooled off the plate is finished and is carried or sent over for printing.

A sample of printed matter, made through the process above described from what was termed a "regular matrix mat," and also a sample of printed matter made by such process from the imported

material, were admitted in evidence. Said witness testified that the involved merchandise was not suitable for a stereotype-matrix mat because of its rough, uneven, and porous surface, lack of uniformity in thickness, and lack of tensity; said witness Russell testified that in using the matrix made from the involved material he used less pressure than usual because otherwise it would crack and allow the heated metal to run through the matrix, and that the printing from the plate made by the matrix produced from the involved merchandise was of very poor quality.

Another witness on behalf of appellee was one Thompson, who testified that he was stereotype superintendent of the New York Herald-Tribune and had occupied that position for ten years; that he made a stereotype-matrix from the involved merchandise and had a proof printed from the plate cast from this matrix. The matrix and proof were introduced in evidence. He testified that the involved merchandise was not a finished product because not calendered or coated, and that uniformity of thickness was essential in matrix mats; that he would not, as superintendent of the stereotype department of the Herald-Tribune, use in the regular work of that plant any material that would produce an impression or print such as he produced from the imported material.

Another witness on behalf of appellee was one Cooper, who testified that he had been a stereotypist for 38 or 40 years, and produced stereotype plates for thirty small weeklies, and also plates for use in a great variety of printing; that he made a stereotype matrix from the involved merchandise and printed a proof made from this matrix. Both were introduced in evidence. Said witness stated that the involved merchandise was not stereotype mat but an ordinary piece of cardboard; that a stereotype mat must be coated; that the involved merchandise was not coated, but had a porous surface; that "It is not a mat until the coating is on;" that he had bought uncoated material from a paper company, and that this material was not called "uncoated mats," but "blotters."

One Hillegas, a witness on behalf of appellee, after examining the samples of the imported merchandise, testified that he had dealt in similar material and was familiar with its uses; that it was used for the manufacture of fiber suitcases, heeling boards, and counterboards for shoes; that it was sold interchangeably under the names of leather board, fiberboard, pulpboard, and mechanical board; that he had never sold merchandise like that here involved as matrix mat or board, and that matrix board that he had sold had been coated and calendered and was of a uniform thickness. Upon cross-examination the witness stated that the involved merchandise was too light for shoe counters.

Warren F. Moore, a chemical engineer, a witness on behalf of appellee, testified that he had analyzed a sample of the involved merchandise and found it to consist of—

chemically treated pulp about 85 percent; about 10 percent ground wood, or as it is sometimes called, "mechanical pulp;" and a trace of rag, 5 percent.

His written report was received in evidence. A government chemist's report containing a quantitative analysis of samples of the involved merchandise was also received in evidence. This report differs from the report of the said witness Moore in that the Government chemist's report shows 64.8 to 68.0 per centum of chemically treated wood pulp, 3.6 to 3.8 per centum of mechanical treated wood pulp, and 3.6 to 3.8 per centum of rag pulp. Each report gives the analysis of two samples.

Of course, this discrepancy in the two reports may have arisen from difference in samples of the involved merchandise, but the record furnishes no information upon that point.

On behalf of the Government, one Harrington, superintendent of the stereotype department of the New York Journal and American, testified that he made a matrix from mats ordinarily used in his plant, which matrix was received in evidence, marked as Illustrative Exhibit B; a print made therefrom was also received in evidence, marked Illustrative Exhibit B-1; the witness further testified that he also made a matrix from the involved merchandise, and a print therefrom, both of which were received in evidence and marked Exhibit 5 and Exhibit 5-A, respectively; he stated that there was no difference between said Exhibit 5-A and Illustrative Exhibit B-1, one being as good as the other in every detail.

Another witness on behalf of the Government was one Bradie, who testified that he was in the dry mat business and connected with the Certified Dry Mat Corporation, which corporation furnished the Brooklyn Eagle with the mats used by that paper; that his company manufactures and sells coated and uncoated mats and calendered and uncalendered mats, and that he had seen them used; that uniformity of thickness is essential in newspaper work; that coating and calendering are finishing processes after the mat is completed and depend upon the requirements of the customer, and that the involved merchandise is similar to the domestic product before it is calendered.

The third witness for the Government was one Hogan, who testified that he was a stereotypist in charge of United Features Syndicate Service; that he had been a stereotypist since 1919; that he had a matrix made from the involved merchandise, which matrix was produced and admitted in evidence as Exhibit 9; he testified that he also had a matrix made from a domestic stereotype mat, which matrix was produced and admitted in evidence as Exhibit 9-A. Two printed pages of the Brooklyn Eagle, produced by plates made from

Exhibit 9 and Exhibit 9–A, respectively, were admitted in evidence and marked Illustrative Exhibits E and F. Said witness further testified that there is no difference in the quality of the two prints, and that for syndicate work mats do not have to be either coated or calendered.

It is conceded that the involved merchandise is neither coated nor calendered.

Much testimony was introduced upon both sides with respect to the conditioning, by moistening, of the involved merchandise to fit it for use in the making of a matrix therefrom. This testimony is immaterial with respect to whether or not the involved merchandise is stereotype-matrix mat or board, for the reason that the evidence is uncontra-dicted that all dry stereotype-matrix mat or board must be so con-ditioned before making a matrix therefrom.

Counsel for the Government, in their brief and upon oral argument, stress strongly certain testimony of appellee's witnesses given upon cross-examination, which they claim greatly weakens the probative force of their testimony upon direct examination, hereinbefore summarized. Appellee's counsel also calls our attention to certain testimony of the Government's witnesses, given upon their cross-examination, which he claims weakens the probative force of their testimony upon direct examination. We do not deem it necessary here to set out or summarize the testimony given upon cross examination by the various witnesses, although we have carefully considered the same.

It is the well-established rule that we will not disturb findings of fact of the Customs Court unless clearly contrary to the weight of the evidence. *United States* v. *Belgam Corp. et al.*, 22 C. C. P. A. (Customs) 402, T. D. 47402; *United States* v. *Riebe*, 1 Ct. Cust. Appls. 19, T. D. 30776. Applying this rule here, we cannot conclude, after reviewing all of the evidence in the case, that the finding of the trial court that the involved merchandise is not stereotype-matrix mat or board is clearly contrary to the weight of the evidence. The trial court no doubt duly considered the alleged inconsistencies in the testimony claimed by the respective parties hereto. Having heard the witnesses testify, it could form a better judgment of the character of the testimony and its credibility than can this court. *Callbeck* v. *United States*, 21 C. C. P. A. (Customs) 1, T. D. 46318.

We would observe that the only question involved upon this branch of the case is a question of fact, upon which there is conflicting evidence, and we merely hold that the finding of the trial court that the involved merchandise is not stereotype-matrix mat or board is not clearly contrary to the weight of the evidence.

The next question to be considered is whether the trial court erred in holding, upon the evidence in the record, that the involved mer-

chandise is classifiable under said paragraph 1402, as claimed in appellee's protest.

The trial court found that the involved merchandise is "uncoated cardboard having a rough surface."

The witness Cooper testified that the involved merchandise was "just an ordinary piece of cardboard." The evidence establishes that the involved merchandise comprises 68 to 72 per centum of wood pulp, and from 3 to 4 per centum of rag pulp.

Webster's New International Dictionary defines *cardboard* as:

A stiff compact pasteboard of various qualities, for making cards, etc.

The word *pasteboard* is defined by the same dictionary as follows:

1. A stiff material made by pasting several sheets of paper one upon another; hence, loosely, any kind of paper board, as that made by the union of thin layers of paper pulp or by pressing pulp into molds.

It is our opinion that, in view of the evidence relating to the composition of the involved merchandise, together with the other evidence in the case, and our inspection of the exhibits in evidence representing said merchandise, the trial court, having found that the merchandise in issue was not stereotype-matrix mat or board, did not err in holding that it was classifiable under the provision in said paragraph 1402 for "Paper board, wallboard and pulpboard, including cardboard."

If it was not technically cardboard, we think the record sufficiently establishes that it was pulpboard, and the protest claims both pulpboard and cardboard. Both *eo nomine* designations are in the same sentence in said paragraph 1402 and carry the same rate of duty.

For the reasons herein stated, the judgment of the United States Customs Court, Second Division, is *affirmed*.

BLAND, Judge, concurs in conclusion.